**<u>EXHIBIT A</u>**

IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

| | |
|---|---|
| **MARCELINE WHITE**<br>1531 Park Avenue<br>Baltimore, MD 21217<br><br>*On behalf of herself individually and<br>similarly situated persons.*<br><br>Plaintiffs<br><br>*v.*<br><br>**NEWREZ LLC d/b/a SHELLPOINT<br>MORTGAGE SERVICING**<br>1100 Virginia Drive, Suite 125<br>Fort Washington, PA 19034<br><u>SERVE ON:</u><br>CSC-Lawyers Incorporating Service,<br>    Resident Agent<br>7 St. Paul Street, Suite 820<br>Baltimore, MD 21202<br><br>&<br><br>**FEDERAL NATIONAL MORTGAGE AS-<br>SOCIATION**<br>Midtown Center<br>1100 15th Street, NW<br>Washington, DC 20005<br><u>SERVE ON:</u><br>David Benson, President<br>Midtown Center<br>1100 15th Street, NW<br>Washington, DC 20005<br><br>    Defendants | Civil Case:<br><br>C-02-CV-20-001060 |

## CLASS ACTION COMPLAINT

### &

## REQUEST FOR JURY TRIAL

Plaintiff Marceline White ("**White** or "**Named Plaintiff**"), on her individual behalf and on behalf of similarly situated individuals defined *infra*, by their attorneys, Phillip R. Robinson and the Consumer Law Center LLC and pursuant to MD. RULE 2-231 (Class Actions), sue NewRex LLC (f/k/a New Penn Financial, LLC) d/b/a Shellpoint Mortgage Servicing ("Shellpoint") and the Federal National Mortgage Association ("Fannie Mae")(collectively "Defendants"). White, on behalf of herself and similarly situated persons, demands a trial by Jury on all counts for which a right to trial by jury is allowed and, in support of their Class Action Complaint, state:

INTRODUCTION

1.      In these instances, such as the underlying matters involving Shellpoint, the mortgage servicer places its interest and pattern of unsafe and unsound mortgage service practices above the remedial rights of homeowners and consumers. Moreover, Shellpoint unfairly and deceptively ignores its statutory and contractual duties including those which were agreed to as part of their license to legally operate in the State of Maryland and nationwide.

2.      In this action Shellpoint has imposed certain fees and charges onto the residential, mortgage accounts of White and the putative class members she seeks to represent for excepting payments by telephone and/or by the Internet. These so-called convenience fees are not authorized by the documents governing the Plaintiff's loan and the putative class members' loans.

3.      By their contract and agreement, Fannie Mae and Shellpoint also have a joint, common interest in relation to White's loan subject to this action. Upon information and belief based on the guidelines published by Fannie Mae, Shellpoint has agreed to indemnify Fannie Mae for its actions on Fannie Mae's behalf in relation to White and certain of the putative class members defined *infra*. However, at all times relevant and material herein, Shellpoint has acted with Fannie

Mae's express authority and Fannie Mae has taken no steps to stop Shellpoint's unfair and decep-
tive acts and omissions on its behalf and ratified those acts and omissions to its benefit.

### JURISDICTION AND VENUE

4.      This Court has jurisdiction asserted for the claims herein because Shellpoint trans-
acts business, performs work in, and has interested in real property, and provides services in Mar-
yland and Anne Arundel County, Maryland.  *See e.g. Pacific Mortg. and Inv. Group, Ltd. v. Horn*,
100 Md.App. 311, 324 (Md.App.,1994)(person who "buys and sells [] mortgage liens has done
more than merely transacted business…but has, in fact, carried on a regular business").

5.      This Court also has jurisdiction for the claims asserted because the injuries caused
by Shellpoint to the Plaintiffs and certain of the putative class members occurred in Maryland.

6.      Further, Shellpoint owns real property, or has an interest in real property in the State
of Maryland and Anne Arundel County thereby subjecting itself to the jurisdiction of this Court.

7.      The Court has declaratory judgment authority pursuant to CTS & JUD. PROC. § 3-
409.

### PARTIES

8.      Plaintiff Marceline While ("White") is a natural person who owns the real property
known as 1531 Park Avenue, Baltimore, Md  21217 ('White Property").  White is also the bor-
rower on the mortgage loan subject to this action which is associated with the White Property and
was utilized entirely for personal, consumer purposes ("White Loan").  The White Loan is a fed-
erally related mortgage.  White is also a borrower pursuant to COM. LAW § 12-1001(c).

9.      Shellpoint is a wholly-owned subsidiary of Shellpoint Partners LLC, a Delaware
limited liability company. Shellpoint Partners LLC is wholly-owned by NRM Acquisition LLC
and NRM Acquisition II LLC, both of which are Delaware limited liability companies. Both NRM

Acquisition entities are wholly-owned by New Residential Mortgage LLC, a Delaware limited liability company. New Residential Mortgage LLC is wholly-owned by New Residential Investment Corporation, a Delaware corporation. New Residential Investment Corporation is publicly traded on the New York Stock Exchange under the ticker symbol NRZ.  In addition:

      a.    NRZ advertises on its website the reason why it is focused on Shellpoint's business model which acquires the mortgage servicing rights from others.  "A mortgage servicing right (MSR) provides a mortgage servicer with the right to service a pool of residential mortgage loans in exchange for a portion of the interest payments made on the underlying residential mortgage loans. Advances are required capital outlays by the servicer to fund missed payments from delinquent borrowers and foreclosure-related expenses. The servicer has limited risk of not being reimbursed for advances, because advances are almost always 'top of the waterfall' in the event of a property sale" (https://www.newresi.com/about-us).  In other words, Shellpoint makes more money on behalf of NRZ by churning fees and making advances related to borrowers it believes are delinquent or in foreclosure and there is "limited risk" that those sums will not be reimbursed to it—even if it has no right to impose the fees and charges in the first instance.

      b.    Shellpoint is a mortgage lender and servicer as defined by FIN. INST. § 11-501(j)(n).

      c.    Shellpoint is a debt collector pursuant to 15 U.S.C. §1692a(6) as it acquired the servicing right to the Plaintiffs' loans and certain of the similarly situated persons they represent when it believed the loans were delinquent or in default.

      d.    Shellpoint is also a collector as defined by CTS. & JUD. PROC. § 14-201(b).

      e.    Shellpoint is a mortgage servicer subject to RESPA and the remedies and protections for borrowers stated in 12 U.S.C.A. § 2605.

       f.      Shellpoint is a credit grantor pursuant to COM. LAW § 12-1001(g).

    10.    Fannie Mae is the owner of White's loan. Maryland law recognizes that mortgage assignees like Fannie Mae step into the shoes of the assignors. *See e.g.* REAL PROP. § 2-103; *Thompkins v. Mountaineer Investments, LLC*, 439 Md. 118, 139 (2014). Fannie Mae, as the assignee of those who originally made the loans, stands in their shoes and is therefore the maker of White's loan. Fannie Mae requires that Shellpoint service its agreements with White in accordance with Maryland law and is responsible for the acts of its authorized servicer; Shellpoint has a duty to notify Fannie Mae when White noticed it of its errors and has access to all of Shellpoint's records related to White pursuant to its policies and practices. Finally, it is widely recognized that Fannie Mae routinely acquires loans from others, including the former Countrywide Home Loans, who extend on its behalf and in accordance with its guidelines. In fact, it publishes forms, guidelines, and more for persons to use when arranging sales of loans to Fannie Mae and publishes the same on its website: https://www.fanniemae.com/singlefamily/originating-underwriting. Fannie Mae is also a credit grantor pursuant to COM. LAW § 12-1001(g).

## FACTUAL ALLEGATIONS

### *General Allegations About Shellpoint's Knowledge*

    11.    All persons, including licensed mortgage lender/servicers in the State of Maryland like Shellpoint, are expected to know the law—including the laws governing their activities. As part of its license to even conduct business in the State of Maryland Shellpoint "has a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the advertisement, solicitation, making, servicing, purchase, or sale of any mortgage loan." MD. CODE REGS. 09.03.06.20. White and other borrowers like White are third party beneficiaries of MD. CODE REGS. 09.03.06.20.

12.     The Court of Appeals in 2005 recognized that a real estate professional who had no direct communication with a borrower nevertheless had a duty to a consumer under the Maryland Consumer Protection Act and Maryland common law to make a "reasonable investigation" of the true facts in the real estate transaction on which the borrower (and other parties) would rely in order to complete the transaction. *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276 (2005). This duty of care applies to Shellpoint and Fannie Mae as its work involves secured, consumer mortgage loans subject to Maryland and Federal laws those discussed herein.

13.     Pursuant to 12 C.F.R. § 1024.38(b)(1)(i), Shellpoint is required to "[p]rovide accurate and timely disclosures to a borrower as required by [12 C.F.R. § 1024.38] or other applicable law." Pursuant to 12 C.F.R. § 1024.35(b)(5), Shellpoint is not permitted to "impos[e]… a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower." It is unreasonable and a violation of its duties for Shellpoint to impose and collect sums never properly disclosed to the borrower.

14.     Pursuant to 12 U.S.C.A. § 2605(k)(1)(C)(E), Shellpoint has duties to the Plaintiffs and putative class members to (i) take appropriate steps to avoid foreclosure as part of its standard servicer's duties and (ii) comply with any other obligation(s) found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of 12 U.S.C.A. § 2605. Amongst these obligations are the servicer's duties to comply with state laws and regulations that are not expressly preempted by RESPA; in other words Congress and the CFPB expressly intended for RESPA to work in concert with state regulation. *See e.g.* 12 U.S.C.A. § 2605(h) and 12 C.F.R. § 1024.33(d) (expressly limiting preemption to certain notice issues).

15.    The Maryland Mortgage Fraud Protection Act, REAL PROP. § 7-401, *et seq.*, estab-
lishes a statutory duty upon Shellpoint to disclose to mortgage borrowers, homeowners, and its
predecessor servicers with respect to the mortgage lending process in an honest and truthful man-
ner. *Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502, 531 (D.
Md. 2013); *Castle v. Capital One, N.A.*, No. CIV.A. WMN-13-1830, 2014 WL 176790, at *5 (D.
Md. Jan. 15, 2014; *Stovall v. SunTrust Mortgage, Inc.*, No. CIV.A. RDB-10-2836, 2011 WL
4402680 (D. Md. Sept. 20, 2011).

16.    In addition, Shellpoint and Fannie Mae also understands and is aware that it is
widely recognized in the secondary mortgage market that much of the loan data transferred by
other mortgage entities to it is inaccurate as exemplified by the following:

     a.  The Mortgage Servicing Collaborative ("MSC") of the Urban Institute's Hous-
         ing and Finance Policy Center has identified in its comprehensive report, *The
         Case for Mortgage Servicing Data Standards* (Urban Institute, 2018) (the
         "MSC Report) that "[D]uring the foreclosure crisis when hundreds of billions
         of dollars of servicing portfolios were transferred from one servicer to another
         in a short period...Some [transfers between servicers] were affected by wide-
         spread data errors that led to borrower harm through missed opportunities for
         loss mitigation, misapplication of escrow payments, or erroneous fees. Ser-
         vicers incurred significant financial costs, penalties, and reputational harm." *Id.*
         at 6 (citations omitted).

     b.  A 2017 market survey of the servicing industry conducted by the Federal
         Housing Finance Agency, i.e. *Future of Mortgage Servicing: Market Sur-*

*vey Results* (Apr. 2018), identified the known challenges faced by the mort-
gage servicing market including that "[a]pproximately 60% of respondents in-
dicated the key challenges for servicing transfers are ensuring data accuracy
and completeness, and minimizing borrower impacts." *Id.* at 6. More specifi-
cally the FHFA survey found,

- Respondents stated that varied data and document standards followed
  by different servicers leads to data inconsistencies and gaps during the
  [Mortgage Servicing Rights (MSR)] transfer process.
- Respondents also expressed that system limitations inhibit the ability to
  effectively execute MSR transfers.
- Servicer transfer processes can be manual and time consuming with the
  need to map every data field, even when transferring to the same servic-
  ing system.
- 50% of nonbanks also highlighted document custody as one of
  their top three challenges in transferring servicing. *Id.*

c. The credit rating agencies who review the secondary mortgage market of resi-
dential mortgage-backed securities for investors also account that loans availa-
ble on the secondary market are characterized by "impaired payment histories
[which impact]…the servicer's ability to foreclose and liquidate the property."
FitchRatings: Structured Finance, U.S. RMBS Non-performing Loan Criteria –
Effective Aug. 12, 2016 to Dec. 1, 2016 at Page 6.

17.    The problems involved in the integrity of loan data in servicing transfers is well
known by state-based regulators (including Shellpoint's regulators as a licensed collection agency
and mortgage lender) as well. *See e.g.* Conference of State Bank Supervisors' Proposed Regula-
tory Standards for Non-Bank Mortgage Servicers at Page 5, 11 ("Regulators and the industry have
also recognized widespread data quality and integrity issues, especially in the context of transfer-
ring servicing rights. Non-bank mortgage servicers often struggle to integrate acquired loan port-
folios, and to locate legal and collateral documents associated with the transferred loans. All of

these issues are exacerbated if a servicer's operational capacity has not kept pace with its growth…[these issues involve not only] data mapping problems so often experienced during a large transfer, but also the compatibility of the data").

### Factual Allegations Relevant to Plaintiff White

18.     White acquired the White Property with her former husband on November 14, 2001. As part of the couple's divorce she became the sole owner of the White Property on March 21, 2007 and White refinanced the Property for the sum of $309,300 with an extension of credit to settle the divorce case on the same date with Countrywide Home Loans, Inc ("White Loan"). The proceeds of the White Loan were utilized entirely for person, consumer purposes by White.

19.     The terms of the White Loan are subject to Maryland's Closed End Credit law ("CLEC"), COM. LAW § 12-1001, *et sec.* Countrywide made this voluntary election on the note it wrote and memorialized for the White Loan and Fannie Mae accepted assignment of the note with this condition and is subject to it. *See* COM. LAW § 12-1001(g)(2)(iii)(applying CLEC to assignees of a CLEC loan). The White Loan qualified as a federally related mortgage when it was originated.

20.     White's prior mortgage servicer Ditech Financial LLC ("Ditech") f/k/a Green Tree Servicing LLC, who acted on behalf of Fannie Mae in relation to the White Loan, is currently in Chapter 11 Bankruptcy Proceedings in the United States Bankruptcy Court for the Southern District of New York (Case No. 19-10412).

21.     Before filing for bankruptcy protection, Ditech was well known to have utilized incorrect and unreliable mortgage data related to the residential loans it serviced including the While Loan. This is exemplified as follows:

        a.      The CFPB filed a complaint Ditech on this basis in the United States District Court for the for the District of Minnesota (Case No. 15-2064) addressing Ditech's inaccurate mortgage, record keeping practices and many related issues.

        b.      In the June 17, 2019 Asset Purchase Agreement in which Shellpoint's parent, NRZ, acquired Ditech's MSRs, including the right to collect upon the White Loan, did not provide adequate representations and warranties to NRZ and Shellpoint that the data transferred to it was accurate and/or reliable.   Further, NRZ and Shellpoint knew Ditech's bankruptcy was due in part to its systems failures and inability to manage mortgage loan servicing functions without cutting corners that led to inaccurate data, record keeping practices, and other related issues.

22.    At all times relevant to this action, Shellpoint has had record and/or actual knowledge of the factual allegations identified in the previous paragraph but still has taken no reasonable steps to inquire about the accuracy of loan data it received from Ditech related to White or any other for Ditech borrower.   Instead it has simply utilized that incorrect information and adopted it into its own records thereby infecting the accuracy of the loan account it manages related to White and the White Loan.

23.    On November 30, 2020, Ditech ceased serving as White's loan servicer and Shellpoint became the loan servicer of the White Loan on behalf of Fannie Mae.

24.    At the time of the servicing transfer from Ditech to Shellpoint, Shellpoint believed White was in default and otherwise was delinquent on the White Loan.

25.    At the time of the servicing transfer from Ditech to Shellpoint, Ditech provided to Shellpoint White's contact information and other material information related to the White Loan. However, Shellpoint did not also did not timely notify White of the transfer as required by 12

U.S.C.A. § 2605(c)("Hello Letter").  Instead, White was not provided the Shellpoint notice re-quired by 12 U.S.C.A. § 2605(c) until approximately April 2, 2020 when it was provided by Shell-point's on-line portal to which White had been given access by it.  However, the notice provided by Shellpoint's on-line portal was materially defective in that it was:

        a.        not addressed to White's actual mailing address (i.e. the White Property ad-dress);

        b.        addressed with an incomplete address for White's counsel that did not iden-tify counsel's name, the name of the law firm, or even the suite number for counsel's office which made it undeliverable;  and

        c.        dated December 10, 2019 but was not delivered to White by Shellpoint until April 2, 2020—109 days after the time required for the notice pursuant to 12 U.S.C.A. § 2605(c).

    26.    Shellpoint was provided sufficient information by Ditech to send correspondence to White as demonstrated by the following:

        a.        On or about February January 22, 2020, it sent a notice of default and intent to foreclose to White at the White Property.

        b.        On or about March 4, 2020, it's vendor sent correspondence to White using Shellpoint's name in care of the complete address for White's counsel (street and suite number completed) claiming falsely that White owed Shellpoint delinquent taxes.

    27.    Since it became White's loan servicer. Shellpoint has also failed to send periodic statements to White identifying certain information as required by 15 U.S.C.A. § 1638(f) and 12 C.F.R. § 1026.41. *See also* COM. LAW § 12-106.

    28.    Notwithstanding Shellpoint's failure to send periodic statements to White as re-quired, she was making payments to "New Rez LLC" at the address provided to her by Ditech's

Goodbye Letter prior to the receipt of the notice of default but upon information and believe Shell-point was not giving White credit for those payments.

29.    Upon information and belief, Shellpoint had reason to know that the address it uti-lized for White for the Hello Letter and periodic statements since it became her servicer through the filing of this complaint was wrong because it or its authorized vendor received notice of the returned mail or inaccuracy from the United States Postal Service that indicated that the address it utilized was wrong but Shellpoint took no reasonable steps to correct the errors or provide timely notice to White.

30.    Since it became the servicer for the White Loan and began utilizing the infected mortgage data it received from Ditech without any reasonable verification, Shellpoint imposed and/or collected the following fees and charges (other than principle and interest) onto White's loan account but never disclosed those fees to White as required by 15 U.S.C.A. § 1638(f), 12 C.F.R. § 1026.41, and COM. LAW § 12-106.  These include:

| | Description | Transaction Date | Amount |
|---|---|---|---|
| a. | "Register Vacant Prop Payment" | March 17, 2020 | $30.00 |
| b. | "Late Charge Payment" | March 17, 2020 | $200.66 |
| c. | "Register Vacant Prop Payment" | March 17, 2020 | $40.00 |
| d. | "Property Pres Payment" | March 17, 2020 | $30.00 |
| e. | "Schd Payment Fee Payment" | March 17, 2020 | $15.00 |

(Convenience Fee for a payment by phone)

31.    The fees and charges imposed identified in the paragraph are actual damages to White in that Fannie Mae, directly and indirectly through Shellpoint, are not entitled to impose

since it did not timely disclose its Hello Letter or even provide to White the accurate periodic statements as required by Federal and State law.   In addition,

     a.    Shellpoint was barred from imposing the fees in ¶ 30(a)(c)(d)(e) pursuant to COM. LAW § 12-1005(a)(2)(i) since Fannie Mae and White have never entered into any "agreement, note, or other evidence of the loan so provides and the borrower agrees in writing to pay those charges."

     b.    Shellpoint was barred from imposing the fees in ¶ 30(a)(c)(d) pursuant to COM. LAW § 12-1027 since the fees imposed are not related to (i) the construction of a new home or (ii) repairs, alternations, or other work required by Fannie Mae or Shellpoint.

     c.    Shellpoint was barred from imposing the fees in ¶ 30(e) pursuant to 15 U.S.C.A. § 1692f(1).

     d.    Shellpoint was barred from imposing the fees in ¶ 30(e) pursuant to COM. LAW § 14-202(11) which makes any violation of the Fair Debt Collection Practices Act, including 15 U.S.C.A. § 1692f(1), a violation of Maryland law.

32.    Using Shellpoint's portal on or about April 2, 2020, White requested and was given a payoff quote from Shellpoint.  In that quote, Shellpoint demanded payoff fees in the amount of $68.00 without the right do so.  Shellpoint and Fannie Mae are not permitted to impose release fees on White for the preparation of the release pursuant to CLEC. COM. LAW § 12-1024.  Further, a release fee, and applicable surcharge that would be owed is only $50.00.  Therefore, the sum claimed by Shellpoint on behalf of and with the express authority of Fannie Mae would be barred by COM. LAW § 12-1024.

33.    The White Loan is not satisfied.

34.     Fannie Mae's and Shellpoint's violations of CLEC are not as a result of any bona fide error or computation since they are express violations of the prohibitions established in CLEC itself. Upon information and belief, the errors are directly the result of NRZ's business practices in relation to the MSRs it has acquired from another to churn all sorts of non-bona fide fees and advances which it will recoup under its business model since these fees and "are almost always 'top of the waterfall' in the event of a property sale."

35.     White disputed the fees and charges imposed and collected by Shellpoint on Fannie Mae's behalf in written correspondence to Shellpoint dated March 18, 2020. Shellpoint received this correspondence on March 27, 2020. Shellpoint took no action in the ten days since receipt of White's notice to it to correct its errors.

36.     As a result of Fannie Mae's and Shellpoint's violations of CLEC there is a controversy between them and White about the sums she owns on her loan. Pursuant to CLEC, because of their violations, White only owes to them the principal amount of the [White Loan] and [Shellpoint and Fannie Mae] may not collect any interest, costs, fees, or other charges with respect to the loan." COM. LAW § 12-1018(a)(2).

37.     In addition, as a further result of Fannie Mae's and Shellpoint's violations of CLEC, they are also required to "forfeit to [White] 3 times the amount of interest, fees, and charges collected in excess of that authorized by [CLEC]." COM. LAW § 12-1018(b).

38.     As a direct and proximate result of Shellpoint's adoption and utilization of mortgage data related to the White Loan which has errors and without any reasonable verification or a policy and practice to even correct the errors it detects, Shellpoint has harmed White by not conveying accurate and timely disclosures and imposing and collecting fees and charges with no proper notice to White. White has also suffered informational injuries as a result of Shellpoint's

conduct related to information Congress and the General Assembly found to be relevant and ma-

terial under Federal and State laws. Shellpoint's failure to convey the necessary information cre-

ated uncertainty, frustration, worry, and fear for White who was denied the information required

by Congress and the General Assembly to be necessary in the mortgage servicing arena and were

vital to the successful achievement of the goals intended for the remedial laws at issue and are the

ones most critical for consumers, without which consumers suffer the most significant harm or

risk of harm.    Congress could not have given a clearer indication of its determination that this

informational injury creates a material case or controversy by permitting White to recovery statu-

tory damages as a result of the violations subject to this action.

## CLASS ALLEGATIONS

39.      The Named Plaintiff brings certain claims, *infra*, on behalf of classes of similarly

situated persons related to Defendant Shellpoint under MD. RULE 2-231 defined as follows:

a.      **Nationwide Convenience Fee Class:**  White also proposes, as the defini-

tion of the Nationwide Convenience Fee Class, that it be defined as follows:

> All individuals in the United States who within one year of commencement of this
> action (i) paid a "convenience fee," (ii) collected in whole or in part by Shellpoint,
> (iii) in order to make a payment on a residential mortgage debt, (iv) where the term
> "convenience fee" was not specifically enumerated in the original agreement cre-
> ating such debt, and (v) where Shellpoint's records indicate that the debt had not
> been current for 30 or more consecutive days at the time Shellpoint began servicing
> it.

b.      **Maryland Convenience Fee Class:**  White also proposes, as the definition

of the Maryland Convenience Fee Class, that it be defined as follows:

> All individuals in Maryland who since October 1, 2018 (i) paid a "convenience
> fee," (ii) collected in whole or in part by Shellpoint, (iii) in order to make a payment
> on a residential mortgage debt, and (iv) where the term "convenience fee" was not
> specifically enumerated in the original agreement creating such debt.

40.     White qualifies as a member of the Nationwide Convenience Fee Class and the Maryland Convenience Fee Class and proposes to be appointed by the Court as the Named Plaintiff for the Nationwide Convenience Fee Class and the Maryland Convenience Fee Class.

41.     Excluded from each of the putative classes are any person who falls within the definitions if the person is (i) an employee or independent contractor of the Shellpoint; (ii) a relative of an employee or independent contractor of the Shellpoint; or (iii) an employee of the Court where this action is pending.

42.     The Class definitions in ¶ 39 as limited by ¶ 41 may be amended or modified.

43.     The particular members of the (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class are capable of being described without difficult managerial or administrative problems.  The members of each putative class are also readily identifiable from the information and records in the possession or control of Shellpoint or its affiliates and agents and from public records.  Shellpoint is required to maintain this information for the entire class period.  *See e.g.* Md. Code Regs. 09.03.06.04.

44.     The putative classes are sufficiently numerous, exceeding more than one hundred persons each, that individual joinder of all members is impractical.  This allegation is based on a data search of public records which identify that thousands of public complaints have been filed against Shellpoint and it services thousands of residential, mortgage loans throughout the United States and as a matter of public records in the State of Maryland alone, Shellpoint has an interest in hundreds of consumer, mortgage loans that were in default or believed to be in default during the class period.

45.     There are questions of law and fact common to the (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class which predominate over any questions affecting only individual members of the putative classes and, in fact, the wrongs alleged against Shellpoint by (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class members and the remedies sought by Named Plaintiffs and the putative class members against the Shellpoint are identical.

46.     These common questions of law or fact for the Nationwide Convenience Fee Class members include but are not limited to:

        a.      Whether Shellpoint is a "debt collector" as that term is defined under the FDCPA;

        b.      Whether Shellpoint's conduct violated the FDCPA;

        c.      Whether the members of the class are entitled to the convenience fees collected from them as actual damages; and

        d.      Whether the members of the class are entitled to additional statutory damages as a result of the frequency, persistence, and intentionality of Shellpoint's conduct.

47.     These common questions of law or fact for the Maryland Convenience Fee Class members include but are not limited to:

        a.      Whether Shellpoint is a "collector" as that term is defined under the MCDCA;

        b.      Whether Shellpoint's conduct violated the MCDCA; and

        c.      Whether the members of the class are entitled to the convenience fees collected from them as actual damages.

48.     Shellpoint's defenses (which defenses are denied) would be typical or identical for each of the member of the (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class and will be based on the same legal and factual theories.

49.     Certification of the (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class under MD. RULE 2-231 is appropriate as to the members of teach putative class in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy.

50.     A class action will cause an orderly and expeditious administration of claims by the members of the (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class and economies of time, effort and expenses will be fostered and uniformity of decisions will be insured.

51.     The only individual questions concern the identification of members of the (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class.  This information can be determined by a ministerial examination of public records or from Shellpoint's business records or other sources, which are admissible as an exception to the hearsay rule and as a statement by a party.

52.     White's class claims are typical of the claims of the (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class members pursuant to MD. RULE 2-231 since they are based on and arise out of identical facts constituting the wrongful conduct of the Shellpoint.

53.     White will also fairly and adequately represent and protect the interests of the (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class.  White is simi-

18

larly situated with, and have suffered similar injuries as, the putative classes they propose to represent. She has also retained counsel experienced in consumer class actions including actions involving unlawful collection and mortgage servicing practices. White does not have any interests which might cause her not to vigorously prosecute this action or are otherwise adverse to the interests of the members of the (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class. She feels she and the putative class members have been wronged, wishes to obtain redress of the wrong, and want Shellpoint stopped from failing to comply with its mandatory duties that form the basis of the class claims.

54.     The (i) Nationwide Convenience Fee Class and (ii) the Maryland Convenience Fee Class members have suffered actual damages, losses, and harm similar those sustained by White.

### COUNT I: VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
#### ("FDCPA"), 15 U.S.C. § 1692, *et seq.*
#### (On behalf of the Named Plaintiff Individually and
#### on behalf of the Nationwide Convenience Fee Class against Shellpoint)

55.     The Named Plaintiff adopts by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth. This claim is brought on behalf of White individually and as the named plaintiff on behalf of the Nationwide Convenience Fee Class against Shellpoint.

56.     Shellpoint acquired its interest in the loans of the Nationwide Convenience Fee Class members when it alleges (directly and indirectly) and believed the loans were in default and therefore Shellpoint is a Debt Collector within the meaning of 15 U.S.C. § 1692a(6).

57.     In relation to the Plaintiff and the Nationwide Convenience Fee Class members, Shellpoint is also a debt collector pursuant to 15 U.S.C. §1692a(6) because its principal business activity utilizes instrumentalities of interstate commerce or the mails related to the enforcement of

security interests as described in 15 U.S.C. §1692f(6) which bars certain debt collectors, like them, from threatening to take any nonjudicial action to effect dispossession of property when there is no present right to possession of the property claimed as collateral when the debt collection action is barred as a matter of law.

58.     By imposing and collecting from White and the Nationwide Convenience Fee Class members fees to accept payments over the phone or by the internet when the loan documents governing the charges and fees owed on White's and the Nationwide Convenience Fee Class members' loans do not authorize such fees and charges, Shellpoint has acted unfairly or with un-conscionable means to collect or attempt to collect from White and the Nationwide Convenience Fee Class members in violation of 15 U.S.C. § 1692f.

59.     Plaintiff and the Nationwide Convenience Fee Class members have suffered actual economic and non-economic damages, as more fully described *supra* as a result of the Shellpoint's illegal debt collection practices and direct and indirect actions described herein.

60.     The FDCPA provides for statutory damages in addition to actual damages.  The Plaintiff and the Nationwide Convenience Fee Class members are entitled to their actual damages and statutory damages allowed under the FDCPA.

### COUNT II: VIOLATIONS OF MARYLAND'S CONSUMER DEBT COLLECTION ACT ("MCDCA"), COM. LAW § 14-201, *et seq.*, & MARYLAND'S CONSUMER PROTECTION ACT ("MCPA"), COM. LAW §§ 13-101 *et seq.*
#### (On behalf of the Plaintiff White Individually and on behalf of White and the Maryland Convenience Fee Class against Shellpoint)

61.     White adopts by reference the factual allegations contained in the preceding para-graphs of this Complaint with the same effect as if herein fully set forth.  This claim is brought on behalf of White individually and as the named plaintiff on behalf of the Maryland Convenience Fee Class against Shellpoint.

62.    At all times described herein since October 1, 2018, Shellpoint has acted as a collector by attempting to collect upon alleged, invalid debts and sums claimed due from White and the Maryland Convenience Fee Class members arising out of consumer transactions—their mortgages loan used for personal, consumer purposes related to the Property. COM. LAW §14-201(b).

63.    Shellpoint is aware of the Federal and State laws governing its activities described herein but recklessly disregarded those laws and duties without any consideration of the negative consequences to White or the Maryland Convenience Fee Class members.

64.    Shellpoint also attempted to collect and did in fact collect unlawful convenience fees for accepting payments by telephone and/or other the Internet from White and the Maryland Convenience Fee Class members in violation of the terms of the documents governing their loans.

65.    Maryland's debt collection and mortgage lending laws and Shellpoint's duties under Maryland law, do not permit them to utilize methods and means of collection not permitted by law or the relationship governing the parties. Shellpoint knows the law. However, it knowingly and recklessly attempted to interfere or otherwise infect White's and the Maryland Convenience Fee Class members' rights on the basis of alleged sums not lawfully due. By such acts Shellpoint has engaged in conduct which violates §§ 804 through 812 of the Federal Fair Debt Collection Practices Act including but not limited to 15 U.S.C. §§ 1692e, § 1692f. COM LAW §14- 202(11).

66.    Shellpoint's violations of the MCDCA are also *per se* violations of the MCPA. COM. LAW § 13-301(14)(iii).

67.    The mortgage loan servicing and collection practices described herein by Shellpoint, as set forth herein, are governed by the Maryland Consumer Protection Act ("MCPA"), COM. LAW. § 13-101, *et seq*.

68.    COM. LAW. § 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts. The collection and attempted collection of the of convenience fees by Shellpoint related to its debt collection practices involves both the extension of credit and the collection of debts.

69.    COM. LAW. § 13-303 also prohibits unfair or deceptive trade practices in the sale or provision of consumer services, such as those provided by Shellpoint.

70.    The MCPA defines unfair or deceptive trade practices to include, *inter alia*, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive. COM. LAW §§13-301(1) and (3).

71.    Shellpoint's acts and omissions described herein, and including but not limited to seeking and demanding sums not legally or contractually due from White and the Maryland Convenience Fee Class members, constitutes unfair and deceptive trade practices in violation of COM. LAW § 13-301(1)(3) and COM. LAW §§13-303(4)(5).

72.    White and the Maryland Convenience Fee Class members reasonably relied upon the material acts and actions of Shellpoint as exemplified *supra* and further demonstrated herein (i) by their communications with Shellpoint, and (ii) their payment of the illegal convenience fees demanded by Shellpoint.  Shellpoint's acts omissions are simply unreasonable, unfair, abusive, and deceptive.

73.    Had Shellpoint not acted unfairly and deceptively, White and the Maryland Convenience Fee Class members would not have suffered the damages and losses they have described *supra*.

74.     Plaintiff has pled sufficient facts to put Shellpoint on notice as to the claims against each as exemplified *supra* (i.e. dates of key acts and representations of Shellpoint and its agents and representatives; and the regulatory and statutory duties of Shellpoint which it simply ignored and thereby infected the subject transactions to ensure harm and damage to White and Maryland Convenience Fee Class members).

### Count III:  DECLARATORY JUDGMENT
CTS & JUD. PROC. § 3-409 & COM. LAW § 12-1018(a)(2)
**(On behalf of the White Individually against
Shellpoint and Fannie Mae)**

75.     White adopts by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth.  This claim is brought on behalf of White individually against Shellpoint and Fannie Mae.

76.     The Maryland Commissioner of Financial Regulation notified all of its licensees, including Shellpoint, on January 7, 2014 that property inspection fees may not be imposed upon or collected from Maryland mortgage borrowers.  Shellpoint received this notice and otherwise had notice of it from the Commissioner's website but continued to collect inspection fees more than ten days later including from White in March 2020 without the right to so.

77.     By disregarding the remedial rights and protections for White stated in CLEC and imposing and collecting sums from White not authorized by CLEC as discussed *supra*, Shellpoint and Fannie Mae as credit grantors under CLEC are only permitted to "collect only the principal amount of the [White Loan] and may not collect any interest, costs, fees, or other charges with respect to the loan" from White.  COM. LAW § 12-1018(a)(2).  Notwithstanding this clear prohibition, Fannie Mae and Shellpoint are continuing to demand 'interest, costs, fees, or other charges' from White.

78.     Fannie Mae and Shellpoint are assignees of the White Loan originated by Country-
wide that is subject by its express terms to CLEC. Fannie Mae and Shellpoint merely stand in the
shoes of Countrywide and have no greater rights than it had to give anyone in relation to the White
Loan. Notwithstanding this clear statement of Maryland law, Fannie Mae and Shellpoint are de-
manding greater rights than Countrywide ever had on the White Loan to give anyone and they are
not permitted to demand as a matter of law.

79.     As a result of Fannie Mae's and Shellpoint's acts and omissions related to CLEC
as described herein, a controversy exists between (i) White and (ii) Fannie Mae and Shellpoint
concerning the sums lawfully due on the White Loan.

## PRAYER FOR RELIEF

A.  WHEREFORE, Pursuant to Count I of this Complaint, Named Plaintiff re-
        quests the Court to certify the National Convenience Fee Class pursuant
        to MD. RULE 2-231 and appoint the Named Plaintiff as class representa-
        tive and the undersigned counsel as Class Counsel;

B.  WHEREFORE, Pursuant to Count I of this Complaint, Named Plaintiff and
        the National Convenience Fee Class members ask this Court to determine
        the issue of Shellpoint's liability to the National Convenience Fee Class
        members under the FDCPA and award (i) actual damages for its viola-
        tions of 15 U.S.C. § 1692f pursuant to 15 U.S.C.A. § 1692k(a)(1) equal
        to the unauthorized sums collected by Shellpoint in a sum in excess of
        $75,000 (on a aggregated basis), (ii) statutory damages pursuant to 15
        U.S.C.A. § 1692k(a)(2) in the amount of $500,000, and (iii) reasonable
        attorney fees and reasonable costs as authorized by 15 U.S.C.A. §

1692k(a)(3).

C.  WHEREFORE, Pursuant to Count II of this Complaint, Named Plaintiff requests the Court to certify the Maryland Convenience Fee Class pursuant
to MD. RULE 2-231 and appoint the Named Plaintiff as class representative and the undersigned counsel as Class Counsel;

D.  Pursuant to Count II of this Complaint, Named Plaintiff and the Maryland
Convenience Fee Class members ask this Court to determine the issue of
Shellpoint's liability to the Maryland Convenience Fee Class members
under the MCDCA and award (i) actual damages for its violations of COM.
LAW §14-202(11), COM. LAW § 13-301(1)(3), and COM. LAW §§13-
303(4)(5) pursuant to COM. LAW § 14-203 and COM. LAW § 14-408 in a
sum in excess of $75,000 (on a aggregated basis) and (ii) reasonable attorney fees and reasonable costs as permitted and authorized by COM.
LAW § 13-301(14)(iii) and COM. LAW § 13-408(b).

E.  WHEREFORE, pursuant to Count III of this Complaint and CTS & JUD.
PROC. § 3-409 and COM. LAW § 12-1018(a)(2), to find and declare that
(i) the relationship between Fannie Mae and Shellpoint on the one hand
and White on the other hand in relation to the White Loan is subject to
CLEC and Fannie Mae and Shellpoint are entitled to no greater rights in
relation to the White Loan than their assignor(s) had to give them; (ii)
Fannie Mae and Shellpoint wrongfully imposed and collected certain fees
and costs from White that are barred by CLEC or otherwise acted in contravention of CLEC and (iii) as a result of their CLEC violations, Fannie

25

Mae and Shellpoint may not collect or attempt to collect any interest,
costs, fees, or other charges with respect to White Loan pursuant to COM.
LAW § 12-1018(a)(2).

F.    WHEREFORE, Named Plaintiff requests the Court provide such other or
further relief as the Court deems appropriate including attorney fees and
costs in relation to Count of this Complaint.

Respectfully submitted,

*//s//Phillip R. Robinson*
Phillip R. Robinson
Client Protection No. 0006210356
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD  20910
Phone (301) 448-1304
phillip@marylandconsumer.com

*Attorneys for the Plaintiff and Putative Class Members*

## RULED 20-201 CERTIFICATION

I hereby certify that this filing does not contain any restricted information.

*/s/Phillip R. Robinson*
Phillip R. Robinson
Client Protection No. 0006210356
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD  20910
301-448-1304
phillip@marylandconsumer.com
*Attorneys for the Plaintiff and Putative Class Members*

## JURY DEMAND

Plaintiff, on her behalf and on behalf of the putative class members, by her undersigned counsel requests a jury trial in this matter.

*//s//Phillip R. Robinson*
Phillip R. Robinson
Client Protection No. 0006210356
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD  20910
Phone (301) 448-1304

27